OPINION OF THE COURT
Rose La Mendola, J.
Defendant, a member of the Seneca Nation of Indians, operates an establishment known as the Seneca Hawk Restau *445 rant and Gift Shop which is located on the Cattaraugus Indian Reservation in the Town of Brant, New York.
On September 2, 1987, members of the New York State Police executed a search warrant at the restaurant and seized a number of “joker poker”, “black jack” and “casino” video machines and electronic slot machines, all alleged to be gambling devices (Penal Law §225.00 [7]). Defendant was subsequently charged with promoting gambling in the second degree (Penal Law § 225.05) and possession of a gambling device (Penal Law § 225.30) in the Town of Brant Justice Court.
Following a motion to remove the matter to this court (CPL 170.25), evidence was presented to an Erie County Grand Jury and the defendant was indicted on four counts of possession of a gambling device and one count of promoting gambling in the second degree.
Defendant has since filed an omnibus motion in which he seeks, inter alia, to dismiss the indictment or, alternatively, to suppress various items of evidence from use at his trial. Because the dismissal motion may obviate the need to address the remaining motions, it will be discussed first.
The question posed by the defendant is whether the State of New York possesses the authority to apply its Penal Law to the offenses charged in view of the defendant’s Indian heritage and in view of the fact that the offenses allegedly occurred on an Indian reservation.
Because defendant’s argument is replete with reference to Indian “sovereignty” as creating a bar to this State’s exercise of its jurisdiction in this case, brief mention of this court’s understanding of the contemporary status of the sovereign nature of Indian nations will be made.
Obviously, Indian nations were at one time entirely sovereign entities. However, through conquest and treaties they were induced to give up complete independence and the right to go to war in exchange for Federal protection, aid, and grants of land (Williams v Lee, 358 US 217, 218 [1959]).
Early in our country’s history, Indian nations, as far as the States were concerned, were considered to be distinct communities, occupying their own “territory, with boundaries accurately described, in which the laws of [a State] can have no force”. (Worcester v State of Georgia, 6 Pet [31 US] 515, 561 [1832].) Authority to regulate Indian affairs was left solely to the Federal Government (Williams v United States, 327 US *446 711 [1946]; United States v Chavez, 290 US 357 [1933]; United States v Ramsey, 271 US 467 [1926]).
Despite this policy of leaving Indians free from State jurisdiction, a policy which at one time was characterized as "deeply rooted” (Rice v Olson, 324 US 786, 789 [1945]), over the years the Supreme Court has modified the principles underlying the policy in cases where essential tribal relations were not involved (Williams v Lee, supra, 358 US, at 219). Thus, by 1880 the court no longer viewed reservations as distinct nations. Rather, in many cases reservations were considered a part of the surrounding State or Territory and subject to its jurisdiction except as forbidden by Federal law (Utah & N. Ry. v Fisher, 116 US 28, 31 [1885]). By 1929, Congress granted States the authority to enforce their sanitation and quarantine laws on reservations and to enforce compulsory school attendance laws (45 US Stat 1185, as amended 25 USC § 231). Indeed, in 1953, the Congress granted civil and criminal jurisdiction to various States over matters involving Indians and arising on Indian reservations (Pub L 280 — Aug 15,1953, 67 US Stat 588, as amended 28 USC § 1360).
Further, Indian tribes have been implicitly divested of their sovereignty in certain respects by virtue of their dependent status (Oneida Indian Nation v County of Oneida, 414 US 661, 667-668 [1974]; Oliphant v Suquamish Indian Tribe, 435 US 191 [1978]). Thus, under certain circumstances a State may exercise its authority over non-Indians for acts occurring on a reservation (Washington v Confederated Tribes, 447 US 134 [1980]; Moe v Salish & Kootenai Tribes, 425 US 463 [1976]) and in exceptional circumstances a State may assert jurisdiction over the on-reservation conduct of Indians (Puyallop Tribe v Washington Game Dept., 433 US 165 [1977]).
In consideration of the foregoing developments, this court takes the view that Indian tribes no longer possess the kind of sovereignty accorded to separate and distinct nations. Rather, the trend is clearly moving away from the concept of sovereignty and towards incorporation of Indian citizens fully within mainstream society. "Congress has followed a policy calculated eventually to make all Indians full-fledged participants in American society. This policy contemplates criminal and civil jurisdiction over Indians by any State ready to assume the burdens that go with it as soon as the educational and economic status of the Indians permits the change without disadvantage to them.” (Williams v Lee, 358 US 217, 220-221, supra.)
*447 This is not to say that Indian tribes no longer possess any of the attributes of sovereignty. Rather, it appears that there have been so many limitations placed upon the concept that it no longer serves, of itself, as a bar to the application of State law on Indian reservations.
With the foregoing in mind, we turn to the first of defendant’s specific challenges to the exercise of New York’s penal authority in this case — i.e., that Congress has not expressly provided that New York may exercise its jurisdiction over acts occurring on Indian reservations located within this State.
The People counter that just such express authorization has been granted through acts of Congress passed in 1948 (62 US Stat 1224, 25 USC § 232) and 1950 (64 US Stat 845, 25 USC § 233) granting this State jurisdiction over, respectively, criminal and civil matters arising on Indian reservations, whether involving Indians or non-Indians. A review of these acts and their legislative histories (1948 US Code Cong Serv, at 2284; 1950 US Code Cong Serv, at 3731) confirms the People’s argument and would, were it not for recent decisions of the Supreme Court and lower Federal courts in cases dealing for the most part with States’ efforts to enforce their bingo laws, end the inquiry and require a denial of the dismissal motion. However, as will be seen, further analysis is required.
Following the Supreme Court’s decision in Bryan v Itasca County (426 US 373 [1976]), wherein the court determined that Congress’ grant of criminal and civil jurisdiction to certain States in Public Law 280 (67 US Stat 588, 18 USC § 1162, 28 USC § 1360) did not constitute a grant of general regulatory authority to the States over Indian affairs, several lower courts drew a distinction between State criminal/prohibitory laws and civil/regulatory laws, having discerned a dichotomy created in Bryan, between the congressional grant of authority over criminal and civil matters arising on Indian reservations (see, Barona Group of Capitan Grande Band of Mission Indians v Duffy, 694 F2d 1185 [9th Cir 1982], cert denied 461 US 929; Seminole Tribe v Butterworth, 658 F2d 310 [5th Cir 1981], cert denied 455 US 1020; United States v Marcyes, 557 F2d 1361 [9th Cir 1977]; Oneida Tribe of Indians v State of Wisconsin, 518 F Supp 712 [WD Wisc 1981]). Generally, these courts have determined that despite the label placed on a State statute, if its intent is to simply regulate conduct occurring on Indian reservations, the statute is unenforceable as Congress did not grant general regulatory authority to the *448 States under Public Law 280 — August 15, 1953. On the other hand, if the intent of a statute was to prohibit certain conduct in the same manner as such conduct is prohibited elsewhere within the State, then the statute is enforceable upon and within a reservation, as Congress did grant States authority to exercise their criminal laws over conduct occurring on reservations.
In its recent decision in California v Cabazon Band of Mission Indians (480 US 202 [1987]), the Supreme Court approved of the prohibitory/regulatory method of analyzing whether a State statute is enforceable under the congressional grant of authority in Public Law 280 — August 15,1953. (480 US 202, 211-212 (supra.) Because this court can discern no difference in the scope and intent of the grant of authority to New York in 25 USC §§ 232 and 233 from that contained in Public Law 280 — August 15,1953, it follows then that the prohibitory/regulatory method of analysis must be pursued to determine whether Ñew York can enforce Penal Law §§ 225.05 and 225.30 in this case.
In Cabazon (supra), the court accepted the Ninth Circuit’s analysis of California’s laws respecting gambling activities within that State (480 US 202, 211, supra) and found that because California permits and, in some instances, promotes gambling activities, it must conclude that the State regulates rather than prohibits gambling in general and bingo in particular (480 US 202, 211, supra). Building upon this finding, defendant argues that because New York permits certain forms of gambling activities within this State and has enacted statutes regulating that conduct (i.e., the Lottery [Tax Law, art 34; § 1600 et seq.]; horse racing and off-track betting [McKinney’s Uncons Laws, ch 2, § 7951 et seq.]; and bingo [Executive Law, art 19-B, § 430 et seq.], and General Municipal Law, art 14-H, § 475 et seq.]), then the penal statutes at issue must be seen as regulatory in nature despite being labeled as criminal. It follows, defendant argues, that because Congress’ grant of civil jurisdiction to New York under 25 USC § 233 was limited to jurisdiction over actions and proceedings involving private disputes arising amongst Indians and did not, therefore, grant New York general civil/regulatory jurisdiction, New York cannot enforce its regulatory gambling laws against the defendant.
While there is weight to this argument, this court is of the opinion that defendant has given Cabazon (supra) too broad a sweep.
As the court noted in Cabazon (supra), the particular State *449 law in question in any given case must be given individual and detailed examination before it can be characterized as either criminal/prohibitory or civil/regulatory (480 US 202, 211, n 10, supra). To this court this means that each State statute and the specific conduct it governs must be analyzed before any conclusions may be drawn.
Under defendant’s interpretation, simply because New York allows some forms of gambling it cannot prohibit any other form of gambling which takes place on an Indian reservation. If this were the case, then the decisions in United States v Marcyes (supra) (approvingly referred to in California v Cabazon Band of Mission Indians, 480 US 202, 211, n 10, supra) and Iowa Tribe of Indians v State of Kansas (787 F2d 1434 [10th Cir 1986]) would have to fall for in both instances the particular State involved permitted general conduct, but was found to prohibit specific conduct.*
The question then appears to be whether New York permits the possession or operation of gambling devices such as "joker poker”, "black jack” or "casino” video machines and electronic slot machines anywhere within the State and whether it permits the promotion or profit from the operation of such devices. The answer is that such conduct or activity is not permitted to any extent in this State. Accordingly the statutes at issue in this case can be characterized as criminal/prohibitory and fully enforceable against the defendant by reason of Congress’ express grant of criminal jurisdiction under 25 USC §232.
Even if this were not the case, Cabazon (supra) suggests an alternative method for determining whether State laws may apply to on-reservation conduct of Indians. That is, the court found that merely because the Congress has not given its express approval to the application of State law, it does not follow that that law may under no circumstance be enforced. Where the State’s interest in applying its law outweighs any competing Federal or Indian interests at stake and where the State’s exercise of its jurisdiction is not incompatible with congressional goals of promoting Indian self-government, self-sufficiency and economic development (480 US 202, 214-216, *450 supra; see also, Mescalero Apache Tribe v Jones, 411 US 145, 148 [1973]; Kake Vil. v Egan, 369 US 60, 75 [1962]; New York ex rel. Ray v Martin, 326 US 496, 499 [1946]), States may apply their laws unless such application is preempted by operation of Federal law (480 US 202, 216, supra).
As indicated earlier in this opinion, the concept of Indian sovereignty does not, of itself, bar or preempt the application of State law to on-reservation activity of Indians. As set out in Rice v Rehner (463 US 713 [1983]), recent decisions of the Supreme Court have departed from the concept of inherent Indian sovereignty as a bar to State jurisdiction over Indians and towards reliance on the principle of Federal preemption (463 US, supra, at 718; see also, McClanahan v Arizona State Tax Commn., 411 US 164, 172 [1973]). The concept of Indian sovereignty remains relevant, however, because it provides a backdrop against which treaties and statutes must be measured in determining whether Federal law preempts State jurisdiction (McClanahan v Arizona State Tax Commn., supra, 411 US, at 172).
In view of the continued relevancy of the concept of Indian sovereignty, there exists a special form of preemption analysis which must be employed other than the usual analysis which focuses mainly upon congressional intent. It is stated thusly: "State jurisdiction is pre-empted by the operation of federal law if it interferes or is incompatible with federal and tribal interests reflected in federal law, unless the state interests at stake are sufficient to justify the assertion of state authority.” (New Mexico v Mescalero Apache Tribe, 462 US 324, 334 [1983].)
The inquiry must be, then, what Federal or Indian interests are interfered with by enforcement of the statutes in this case which prohibit the possession of gambling devices or their promotion. This court can discern none.
This is not a situation where an activity is being conducted on an Indian reservation by an Indian tribe itself for the purpose of raising revenues which would advance the tribe’s economic well-being. To the contrary, the enterprise at issue appears to be operated by an individual member of a tribe for his individual benefit. The mere fact that other Indians may be employed in the conduct of the gambling activity in issue is insufficient to find any important tribal interest in the matter. Indeed, where a whole tribe faced the possibility of loss of significant revenue by the application of a State sales tax to *451 on-reservation sales of tobacco, the Supreme Court found this fact to be unpersuasive in sustaining the State’s authority to impose the tax. (See, Washington v Confederated Tribes, 447 US 134 [1980].)
Furthermore, defendant can point to no history of involvement in the gambling activity in issue which would lead this court to conclude that somehow the application of the statutes would interfere with what remains of the concept of Indian sovereignty or with the continuance of Indian self-government.
Because the State of New York possesses a strong interest in prohibiting the types of gambling activity at issue herein and preventing the corruption it could lead to if not enjoined and because the defendant has not articulated any countervailing Federal or Indian interests in maintaining the particular activity involved, this court finds that application of the penal statutes in issue has not been preempted and are for this reason enforceable against the defendant.
Defendant next challenges New York’s authority to prosecute him upon the basis that through passage of 15 USC § 1175 (64 US Stat 1135) the Federal Government has expressly preempted New York law. Analysis of this statute does not bear out defendant’s claim.
As pointed out by the People, 15 USC § 1175, which, inter alia, makes it unlawful to "manufacture, recondition, repair, sell, transport, possess, or use any gambling device * * * within Indian country”, was intended to act as a support mechanism to States which outlaw slot machines and similar gambling devices and to extend to those Indian lands under exclusive Federal control (1951 US Code Cong Serv, at 4240-4248). There is no indication therefore that Congress intended to preempt all State law in the area of possession and use of gambling devices. Further, even where it may be said that Federal jurisdiction is " 'absolute’ ”, it is not invariably "exclusive” jurisdiction (Kake Vil. v Egan, 369 US, supra, at 68). In this instance the existence of supportive Federal legislation does not work to bar the employment of this State’s gambling statutes.
Defendant’s final challenge to New York’s jurisdiction is based upon his claim that when the Seneca Indian Nation passed the Prohibited Gambling Devices Ordinance as section 120.1 of the Seneca Nation Gaming Laws, the State of New York was preempted from applying its gambling statutes. *452 However, defendant fails to mention that this ordinance was not in effect at the time of the events underlying the instant indictment. Thus, there being no Seneca Nation ordinance governing the conduct, there is no infringement of the Seneca Nation’s right to create rules governing their internal and social relations by reason of the instant prosecution.
In view of all of the foregoing, this court finds that it possesses jurisdiction to hear and determine the offenses charged. Accordingly, the motion to dismiss is denied.
Turning to the other motions brought by the defendant he first moves to preclude the prosecution from introducing any evidence derived from electronic surveillance for failure to timely serve notice under CPL 700.70. The prosecutor responds that no evidence was obtained through electronic means. Accordingly, defendant’s motion is moot and therefore dismissed.
Defendant next moves to suppress certain statements attributed to him upon the basis that they were obtained in violation of his constitutional rights as well as those created under CPL article 60.
In this court’s view, sufficient factual issues have been presented by the affidavits of the respective parties to warrant a hearing. Such hearing is hereby directed to be held at the earliest hearing date available to the court and the parties. The parties are directed to schedule said hearing with the clerk of this court.
Finally, defendant challenges the sufficiency of the application for the search warrant issued by the Town of Brant Court upon the basis that insufficient facts were presented to support a finding of probable cause necessary to support the issuance of the warrant.
This court finds that when viewing the application in a nonhypertechnical manner in the "clear light of everyday experience” and according same "all reasonable inferences” (People v Hanlon, 36 NY2d 549, 559) sufficient information was presented to the issuing Magistrate to authorize his execution of the warrant. Further, the People maintain, and the defendant does not dispute, that at the time of the execution of the warrant defendant’s restaurant was open to the public. Hence, no warrant was necessary as the police were lawfully on the premises and authorized to seize any contraband therein. Accordingly, the motion to suppress the various gambling devices in issue is denied.

 In United States v Marcyes (557 F2d 1361), the State of Washington permitted the display of fireworks in certain controlled circumstances, but prohibited private, unlicensed displays. In Iowa Tribe of Indians v State of Kansas (787 F2d 1434), the State of Kansas permitted bingo under specific circumstances, but was found to specifically prohibit a form of bingo involving "pull-tab” cards.